Wayne A. HEADLEY, et al., Plaintiffs,

v.

CHRYSLER MOTOR CORPORATION,
Defendant.

Civ. A. No. 88–1642–MA.

United States District Court,
D. Massachusetts.

Dec. 18, 1991.

James H. Anderson, Taylor, Anderson &
Travers, Boston, Mass., Thomas J. Lynch,
Thomas J. Lynch, Kerstein & Lynch, Quin-
cy, Mass., for plaintiffs.

Peter M. Durney, Susan M. Donaldson,
Cornell & Gollub, Boston, Mass., for defen-
dant.

MAZZONE, District Judge.

APPROVED and ADOPTED as an OR-
DER of this Court.

REPORT AND RECOMMENDATION

LAWRENCE P. COHEN, United States
Magistrate Judge.

In this products liability case, Defen-
dant's Motion to Dismiss Plaintiff's Com-
plaint or in the Alternative to Preclude
Certain Evidence (# 59) was referred to
this court for report and recommendation
pursuant to the provisions of 28 U.S.C.
§ 636(b) and Rule 3(b) of the Rules for
United States Magistrates in the United
States District Court for the District of
Massachusetts.

A. *Undisputed Facts*

Insofar as relevant to defendant's mo-
tion, the parties have filed a statement of
undisputed facts (Stipulation Regarding
Evidentiary Issues for Hearing, # 71).
Those facts are as follows:

1. On March 27, 1986, the plaintiff,
Wayne Headley was operating his 1983
Plymouth Reliant station wagon ("vehicle"
or "subject vehicle") on Brook Road in Mil-
ton, Massachusetts when he was struck
"head-on" by another automobile ("subject
accident").

2. Following the accident the plaintiff
was taken by ambulance to the Milton
Medical Center where he remained until
April 3, 1986.

3. While still in the hospital, he consult-
ed an attorney regarding the subject acci-

dent and, approximately three weeks to one month later, retained the firm of Abelson, Cohen & Scarpaci.

4. After the accident, the plaintiff's vehicle and the other vehicle involved in the accident were towed to the Blue Hill Towing facility in Quincy, Massachusetts.

5. One or two days after the accident, plaintiff Lori Headley and her sister-in-law, Brenda Headley, photographed the two vehicles involved in the subject accident at the tow yard.

6. Brenda Headley does not recall whether she touched any part of the subject vehicle or opened any of the doors.

7. When the plaintiff was released from the hospital, he went with his wife to the Blue Hills Towing facility and examined the subject vehicle.

8. Mr. Headley stated that during his inspection he moved the seat back and forth freely by pushing on the backrest.

9. On May 8, 1986, Mr. Headley transferred title to the subject vehicle to Commercial Union.

10. Before transferring title, plaintiffs informed Commercial Union on April 7, 1986 that the vehicle was the subject of litigation and that they did not want the vehicle destroyed.

11. N.E.R., who actually had possession of the vehicle, was also notified by the plaintiffs that the vehicle was needed for evidence and that it should not be sold or destroyed.

12. Thereafter, on May 12, 1986, plaintiffs' attorney wrote Commercial Union and again requested that they keep the vehicle available for inspection, because they were "looking into a possibility of a claim on the auto manufacturer, as Mr. Headley's injuries were caused by his seat sliding forward and breaking."

13. In August 1986, plaintiff retained an expert, David A. Collings, to inspect the subject vehicle and to ultimately render an opinion regarding its design and manufacture.

14. Mr. Collings visited the N.E.R. storage facility on two occasions.

15. On August 21, 1986, Mr. Collings examined and photographed the subject vehicle, and on December 4, 1986 he removed the front seat including the track and sliding mechanism from the subject vehicle.

16. Mr. Collings never received permission from or gave notice to Commercial Union before removing the seat, nor did Mr. Collings ever inquire as to whether Chrysler had a chance to examine the subject vehicle before he removed the seat.

17. Mr. Collings removed 4 bolts which secured the seat to the floor, but these bolts were not produced to defendant, and no longer exist.

18. After removal of the seats, Mr. Collings operated the seat adjustment lever, which in turn disengaged the pawls or "teeth" from the corresponding slots in the seat's track, but he does not recall whether he returned them to their original position.

19. Subsequent to the Headleys' and Dr. Collings' inspection of the subject vehicle, it was put on the auction block.

20. Plaintiffs undertook no efforts to obtain custody of or to preserve the vehicle, including its seatbelts which were subsequently destroyed.

21. The vehicle was sold on August 24, 1987 to Jo–John Enterprises for $5.00 and subsequently crushed.

22. Plaintiffs subsequently retained a second expert, Daniel J. Rappaport, to provide testimony regarding the restraint system in the subject vehicle.

23. Mr. Rappaport was retained after plaintiffs filed suit and after the subject vehicle had been destroyed.

24. Mr. Rappaport never examined the subject vehicle or saw the seatbelts.

25. Chrysler and its engineering experts had no opportunity to examine the seat in its actual post-accident position in the vehicle.

26. Chrysler and its engineering experts had no opportunity to examine the bolts which secured the seat to the floor.

27. Chrysler and its engineering experts had no opportunity to examine the seatbelts of the subject vehicle.

## B. *Contention of the Parties*

Defendant contends that since the vehicle was intentionally[1] destroyed prior to an opportunity to examine that vehicle for alleged defects, the complaint should be dismissed. Alternatively, defendant contends that, at the very least, plaintiffs should be precluded from offering any expert evidence concerning alleged defects.

For their part, plaintiffs do not dispute the characterization of the destruction of the vehicle as an "intentional" or "negligent" one.[2] They contend, however, that defendant was not prejudiced in the legal sense, and, accordingly, no sanction is warranted.

## C. *Discussion*
### 1. Controlling Law

■ At the hearing, the parties apparently assumed that—given that this is a

---

**1.** The term "intentionally" is used here to distinguish the destruction from a destruction without any fault whatsoever on the part of the plaintiffs. The record evidence before this court does not suggest that the destruction was wilful in the sense that plaintiffs purposefully destroyed the vehicle with a view towards precluding examination.

More to the point, as used herein, "intentional" means that the vehicle was destroyed by plaintiffs' agent *after* notice that the vehicle should be retained for evidentiary purposes.

**2.** In their Memorandum of Law in Opposition to Defendant's Motion to Dismiss or in the Alternative to Preclude Certain Evidence (# 66, p. 5), filed prior to the hearing on the matter, plaintiffs "... concede[d] that this matter is controlled by the Supreme Judicial Court decision in *Nally v. Volkswagon [Volkswagen] of America, Inc.*, 405 Mass. 191 [539 N.E.2d 1017] (1989)."

Although this court concludes that *Nally* does not *control*, for the simple reason that federal law, not state law, supplies the appropriate rule of decision, the rationale of *Nally*—not inconsistent with federal counterparts—assumed an intentional or negligent destruction of clearly relevant evidence. And even at the hearing before this court, plaintiffs' sole position in its opposition was that defendant had failed to establish any *prejudice* from the destruction.

**3.** Defendant, not surprisingly, looked to Massachusetts law on the assumption that, under the

---

diversity case—disposition of defendant's motion was controlled by state law.[3]

In this court's view, however, it is federal law, not state law, which controls.

To the extent that defendant seeks dismissal, defendant has pointed to no authority holding that—even in diversity cases—state law supplies the rule of decision as to whether a district judge should dismiss a case as a *sanction* for spoliation of relevant evidence. The authority to dismiss a case must spring from the inherent or supervisory authority of the court,[4] or under established sanctions embodied in statute or rule.[5] Despite the nature of the cause, it is for this court, and this court alone, to determine its authority to hear a matter on the merits.

To the extent that defendant seeks preclusion of evidence, the admissibility [or, conversely, inadmissibility] of evidence is governed by the Federal Rules of Evidence, even in diversity cases.[6] It is the Federal

---

holding in *Nally, supra*, spoliation of relevant evidence warranted the sanctions sought, regardless of whether or not any prejudice inured to the detriment of the defendant on account of that spoliation. In this court's view, however, defendant reads too much from too little. To the contrary, the Court in *Nally* ruled, *inter alia* (*Id.* at 191, 539 N.E.2d 1017)—

> In this case, whether Schofield did in fact deliberately or negligently alter the rear hatchback latch mechanism, or deliberately or negligently did in fact lose or contribute to the loss of material items such as bolts, screws, or upholstery, potentially *prejudicing* Volkswagen, are factual questions which must be resolved in advance of a ruling on the admissibility of Schofield's testimony. (Emphasis added).

In *Nally*, the notion of prejudice—at least to some degree—is a touchstone, just as it is in controlling federal law.

**4.** For example, the inherent power recognized under the All Writs Act [28 U.S.C. § 1657].

**5.** For example, Rules 11, 26(e), and 37, F.R.Civ.P.

**6.** Except, of course, that under Rule 501, F.R.Evid., a federal court, in a diversity case, may look to the law of the forum state in determining whether or not a *privilege* applies.

This case does not involve *privilege*.

Rules of Evidence [7] which govern.[8]

## 2. The Need for Prejudice

■ Defendant contends that—given an intentional spoliation of relevant evidence—it is entitled to dismissal and/or preclusion of evidence even in the absence of prejudice.

In this court's view, apart possibly from cases where a party has maliciously destroyed relevant evidence with the sole purpose of precluding an adversary from examining that relevant evidence, and this is not that case,[9] all relevant federal cases—not to mention state cases [10]—look to, among other things, prejudice *vel non* inuring to the adversary.[11] *See e.g., Siegal v. American Honda Motor Co., Inc.,* 921 F.2d 15 (1st Cir.1990); [12] *Lewis v. Darce Towing Co., Inc.,* 94 F.R.D. 262, 266–67 (W.D.La.1982); [13] *Barker v. Bledsoe,* 85 F.R.D. 545, 547–48 (W.D.Okla.1979); [14] *Alexander v. National Farmers Organization,* 687 F.2d 1173, 1205 (8th Cir.1982); [15] *Wm. T. Thompson Co. v. General Nutrition Corp.,* 593 F.Supp. 1443, 1455 (C.D.Cal.1984).[16] For its part, defendant

has cited no authority which holds that—at the very least—the potential for prejudice was not a relevant factor.

## 3. The Appropriate Sanction

■ In the circumstances, this court finds and concludes that exclusion of any and all expert evidence—but not dismissal [17]—is the appropriate sanction. In reaching that conclusion, this court considers those factors set forth in *Lewis v. Darce Towing Co., Inc., supra,* to wit:

> After a review of applicable case law, the court has determined that there are five factors to consider before deciding whether the evidence should be excluded. These include: (1) whether the defendant was prejudiced as a result of the ex parte autopsy; (2) whether the prejudice can be cured; (3) the practical importance of the evidence; (4) whether the plaintiff was in good faith or bad faith; and (5) the potential for abuse if the evidence is not excluded.

When the complaint was initially filed, plaintiffs alleged that their injuries were

---

**7.** For example, Rules 402, 403 and 901(a), F.R.Evid. *See Siegal v. American Honda Motor Co., Inc.,* 921 F.2d 15 (1st Cir.1990).

**8.** Insofar as this court can determine, when the matter of governing law was raised sua sponte by this court at the hearing, none of the parties contended otherwise.

**9.** And defendant does not contend as much.

**10.** *See* footnote 3, *supra.*

**11.** That is not to say that a party seeking dismissal and/or preclusion of evidence must show *actual* prejudice. Although the cases may differ on the *degree* of prejudice—and, indeed, there are those cases which suggest that even the *possibility* of prejudice may suffice, *see Nally, supra*—prejudice is always a factor considered in the mix.

**12.** Although, in *Siegal,* the term "prejudice" was not used, the district judge had determined, among other things, that " '[t]he crucial issue, the condition of the pin, could not be determined by any testing, destructive or otherwise....' ". *Id.* at 17.

**13.** "After a review of applicable case law, the court has determined that there are five factors to consider before deciding whether the evidence should be excluded. These include: (1) whether the defendant was *prejudiced* as a result of the ex parte autopsy; (2) whether the

prejudice can be cured; (3) the practical importance of the evidence; (4) whether the plaintiff was in good faith or bad faith; and (5) the potential for abuse if the evidence is not excluded." (Emphasis added).

**14.** "When an expert employed by a party or his attorney conducts an examination reasonably foreseeably destructive without notice to opposing counsel and such examination results in either negligent or intentional destruction of evidence, *thereby rendering it impossible for an opposing party to obtain a fair trial,* it appears that the Court would be not only empowered, but required to take appropriate action, either to dismiss the suit altogether, or to ameliorate the ill-gotten advantage." (Emphasis added).

**15.** "Obviously, the relevance of and resulting *prejudice* from destruction of documents cannot be clearly ascertained because the documents no longer exist." (Emphasis added).

**16.** "This destruction resulted in *prejudice* to Thompson....". (Emphasis added).

**17.** Of course, this court does not overlook the distinct possibility that preclusion of the expert evidence may well be the functional equivalent of a dismissal, since plaintiffs may well be precluded from establishing a prima facie case at trial.

caused solely by a defect in the seating mechanism. Since that time, however, plaintiffs have added another theory and changed emphasis: They now contend, as a primary theory, that the driver's seat belt was defectively *manufactured* [18]—thus causing plaintiff's injuries.[19] To a lesser extent, they continue to press their claim that the seating mechanism was defectively manufactured.

In contending that defendant was and is *not* prejudiced, plaintiffs offer a suggestion which, at first blush, appears to be plausible, to wit: Both plaintiffs' and defendant's experts will be constrained to render their opinions based on the very same evidence, nothing more, and nothing less. Superficially, of course, that position appears just and reasonable. But it falls on further analysis.

First and foremost, plaintiffs' "two tie, all tie" analysis is simply incorrect. The fact that plaintiffs may have been prejudiced by their spoliation does *not* mean that defendant was and is not prejudiced— that these equal "prejudices", in some manner, cancel each other out.[20]

Secondly, and equally as important, defendant *is* prejudiced in the real sense. Plaintiffs—albeit now handicapped to some extent in their efforts by their own do-

ings—will nevertheless attempt to convince a jury of their peers, by the use of an expert, that plaintiff's injuries were caused by a defective seat belt. As any practicing lawyer worth his or her salt well knows, the proverbial battle of the experts produces uncertain results. If, in truth[21] and fact, examination of the seatbelt revealed no defect whatsoever, then plaintiffs simply would not have any case on this score. But because the crucial evidence was destroyed[22]—after due notice to preserve it— plaintiffs have converted what otherwise might have been a "no win" proposition into the proverbial horse race—the winner being judged on the jury's judgment—imperfect as that may be—as to who scored best as an expert, and *not* on the actual condition of the seatbelt alleged to have been negligently manufactured.

In these circumstances, this court concludes that (1) defendant was, in fact, prejudiced by reason of the fact that its experts have been deprived of an opportunity to review relevant evidence; (2) that that prejudice cannot be cured; and (3) that the evidence which was destroyed was crucial—indeed, the linchpin—to the case as now framed by the plaintiffs.

This court accordingly recommends[23] that Defendant's Motion to Dismiss Plain-

---

**18.** This is *not* a *design* defect case. If it were, it might well be that the destruction of the vehicle, including the seat belt in issue, could cause no prejudice to the defendant, for the simple reason that the issue would focus on the design itself—which was not destroyed—and not the particular seat belt in plaintiffs' vehicle.

**19.** Plaintiffs' new expert would testify that he had deduced the defective manufacture based on impact characteristics.

**20.** Plaintiffs' plea on this score harkens memories of the legal yarn in which a child, having just been convicted of matricide and patricide, sought mercy from the court for the reason that he was then an orphan.

**21.** Truth in the real world, that is, which, of necessity, may well differ from the "truth" announced by the jury's verdict. Although the ultimate aim of the judicial system is to ascertain the real truth, trial is nevertheless, in the scheme of things, an imperfect method, and the "truth" memorialized by the jury's verdict may not necessarily mirror actual truth. That is

why, one might suppose, that Supreme Court precedent still teaches that a tomato is a "vegetable" instead of a fruit." *See Nix v. Hedden,* 149 U.S. 304, 13 S.Ct. 881, 37 L.Ed. 745 (1893).

**22.** Just as it was in *Siegal, supra,* at 17, where the Court observed—

> The district court predicated its exclusionary ruling on its determination, unexceptionable in our view, that "the crucial issue, *the condition of the pin, could not be determined by any testing, destructive or otherwise, of the motorcycle in its present condition, nor could the motorcycle be restored to its former condition.* It was not reliable, probative evidence and was not admissible." (Emphasis added).

**23.** The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must

tiff's Complaint or in the Alternative to Preclude Certain Evidence (# 59) be allowed to the extent that plaintiff be precluded from presenting any expert evidence concerning alleged defects in the vehicle which is the subject matter of this action.

specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this rule shall preclude further appellate review. *See Keating v. Secretary of Health and Human Services,* 848 F.2d 271 (1st Cir.1988); *United States v. Emiliano Valencia–Copete,* 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980); *United States v. Vega,* 678 F.2d 376, 378–379 (1st Cir.1982); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); see also, *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).